1          UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,        )
                                    )
6              Plaintiff,           )
                                    )
7       vs.                         )    Case No. CR-08-1273 SJO
                                    )
8  MARK BENDER,                     )
                                    )
9              Defendant.           )
   _____)

10

11

12                  REPORTER'S TRANSCRIPT OF
        PETITION RE ALLEGATION NO. SEVEN AND SENTENCING
13                  FRIDAY, JANUARY 8, 2016
                          1:14 P.M.
14                  LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22  _____

23        CAROL JEAN ZURBORG, CSR NO. 7921, CCRR
             FEDERAL OFFICIAL COURT REPORTER
24          312 NORTH SPRING STREET, ROOM 414
             LOS ANGELES, CALIFORNIA  90012
25                    (213) 894-3539


                    UNITED STATES DISTRICT COURT

1              **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4      EILEEN DECKER
     United States Attorney

5      BY:  JULIUS NAM
         Assistant United States Attorney

6      United States Courthouse
     312 North Spring Street

7      Los Angeles, California 90012

8   **FOR THE DEFENDANT:**

9      HILARY LEE POTASHNER
     Federal Public Defender

10     BY:  NAEUN RIM
        Deputy Federal Public Defender

11     Central District of California
    321 East Second Street

12     Los Angeles, California 90012

13   **ALSO PRESENT:**

14     JANA RIVERS, Probation Officer

15

16

17

18

19

20

21

22

23

24

25

1          **LOS ANGELES, CALIFORNIA; FRIDAY, JANUARY 8, 2016**

2                          **1:14 P.M.**

3                          --oOo--

4          THE COURTROOM DEPUTY:  Calling Item No. 4:  Case

5   number CR 08-01273 SJO; United States of America versus Mark

6   Bender.

7       Counsel, please state your appearances.

8          MR. NAM:  Good afternoon, Your Honor.  Julius Nam

9   representing the United States.  With me at counsel table is

10  probation officer Jana Rivers.

11         MS. RIM:  Good afternoon, Your Honor.  Naeun Rim on

12  behalf of Mark Bender, who is present, in custody.

13         THE COURT:  Good afternoon.  Please have a seat.

14      The matter is here on the petition regarding the

15  allegation contained in -- I believe it was Allegation No.

16  Seven, Count Seven, which reads:  Having been ordered by the

17  Court not to commit another federal, state or local crime,

18  Mr. Bender possessed marijuana for sales in violation of

19  11359(a).

20      How do you wish to proceed?

21         MR. NAM:  The Government's position is to move to

22  dismiss Allegation No. Seven, Your Honor, and proceed to

23  sentencing at this time.  I believe the probation office has a

24  different position as to the motion to dismiss Allegation No.

25  Seven.  And if the Court would permit the probation officer to

1  address the Court.

2           THE COURT:  Certainly, yes.

3           THE PROBATION OFFICER:  Your Honor, the probation

4  office is asking for a continuance at this time.  We received

5  the motion papers from the defense counsel, and there's a lot

6  of information in there that we would like to investigate

7  further, and we have not had the opportunity to.  Some

8  information can be related to the Allegation No. Seven, which

9  is why we're not -- we're opposing the dismissal at this time,

10  and there may be some other additional probation violations

11  that we are actually looking into.

12          THE COURT:  What other allegations or potential

13  allegations are you looking into?

14          THE PROBATION OFFICER:  We are looking into --

15  definitely there is the issue of association, criminal

16  association, but there's also some questions regarding the

17  activities of the individual in which he was associating with

18  that law enforcement is also investigating.  I have been in

19  contact with them.

20      So what we are asking, so we can get a clearer picture of

21  what is actually going on, the case in San Bernardino,

22  especially, with new information that's been brought to our

23  attention before we proceed.

24          THE COURT:  But if the Court grants the Government's

25  motion to dismiss Allegation No. Seven and the Court rules

```
 1   today regarding the issue of sentencing after hearing counsel

 2   for both sides and defendant, if he wishes to make a statement

 3   separate and apart from his written statement, the probation

 4   office or department will be able to file a new position if

 5   there are separate independent allegations.

 6           THE PROBATION OFFICER:  Yes, Your Honor.  However,

 7   supervision is revoked.  We would not be able to proceed in

 8   that manner.

 9           THE COURT:  Well, what other -- I think you have to

10   be very specific in terms of what other claims you are

11   investigating.

12           THE PROBATION OFFICER:  His associations with

13   Ms. Barry, who actually provided a statement on his behalf in

14   the motion papers, and there's also some questions about her

15   activity that I'm not quite sure if I am at liberty to speak

16   about at this time without further investigating and having

17   further information.

18           THE COURT:  The request to continue would be denied.

19           THE PROBATION OFFICER:  Okay.

20           THE COURT:  The Government has moved to dismiss

21   Allegation No. Seven.

22       And is there any objection to Allegation No. Seven?

23           MS. RIM:  No objection to the dismissal, Your Honor.

24           THE COURT:  Now we go to the issue of sentencing.

25   And Ms. Rim has filed a sentencing pleading containing many
```

```
 1   documents and exhibits attached hereto -- or thereto.
 2        Does the Government wish to respond?  Do you wish to be
 3   heard further?
 4             MR. NAM:  Yes, Your Honor.
 5             THE COURT:  And do you have a recommendation
 6   regarding sentencing?
 7             MR. NAM:  I do, Your Honor.  The Government --
 8             MS. RIM:  I'm sorry, Your Honor.  I think Mr. Bender
 9   might need some water.  Is that possible?  He's a little bit
10   having trouble.
11             THE COURT:  Yes.
12             MS. RIM:  Thank you.
13             THE COURT:  Is your client ill?
14             MS. RIM:  I just showed him a report that the
15   Government produced to me yesterday, and I think he's a bit
16   shocked.  I'm not getting a response.
17             THE COURT:  Mr. Bender?  Mr. Bender, in order for
18   the matter to proceed today, I have to be satisfied that you
19   are fully aware of the proceedings taking place, that you
20   understand the proceedings taking place and the nature of the
21   proceedings.  Your counsel indicates you need some water.  You
22   appear to be extremely quiet.  I just want to make sure, are
23   you suffering from any illness, or do you feel ill or sick?  Do
24   you have any injuries, sir?
25             THE DEFENDANT:  No, sir.
```

1          THE COURT:  And do you feel capable enough to

2     proceed today?

3          I need a response.

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Do you need some water?

6          No water.

7          Yes?

8          MR. NAM:  Thank you, Your Honor.  Is the Court

9     directing me to address the entire sentencing argument or

10    specifically on the points that are made in the defendant's --

11         THE COURT:  No, I think the entire sentencing, your

12    recommendation, and then Ms. Rim has filed, I think, a very

13    thorough sentencing pleading here, attaching various documents

14    and exhibits, which the Court has considered.  I have certain

15    questions regarding certain of the exhibits and certain of the

16    claims.  But before I inquire from counsel, I would like to

17    hear from the Government.

18         MR. NAM:  Yes.  In light of the Court's dismissal of

19    Allegation No. Seven, the remaining violations will be Grade C.

20    So based on a calculation of Grade C and Mr. Bender's Criminal

21    History Category of VI, the guidelines range would be 8 to 14,

22    Your Honor.  I believe that's spelled out in Ms. Rivers' July

23    report before the seventh allegation was presented.

24         So the Government's recommendation is considering both the

25    admitted violations from the last hearing and also the

 1    Government would ask the Court to consider the uncharged

 2    conduct, the dismissed conduct that the Government believes is

 3    relevant conduct.

 4        So in consideration of the totality of the defendant's

 5    history and characteristics, his admitted conduct and relevant

 6    conduct, the Government's recommendation is for 18 months of

 7    custodial time, which is an above-guidelines sentence,

 8    Your Honor, to be followed by 18 months of supervision.

 9        The defendant -- the maximum statutory maximum is 24

10    months of custodial time and three years for supervision, minus

11    any time in custody.  So the Government's calculation is that

12    18 months in custody and 18 months in supervision will max out

13    the three years of possible supervision time.

14        With regard to the defense's argument that uncharged

15    conduct should not be considered by the Court, the Government

16    opposes that particular argument.  The Government -- the Court

17    can consider as part of its 3553(a) consideration the

18    defendant's history and characteristics and his overall conduct

19    during the time of his supervision, not only the admitted

20    violations in this matter.

21        And so I will begin first with the admitted violations,

22    Your Honor.  The defendant has shown a blatant disregard for

23    the Court's conditions and also for the trust that the Court

24    has placed upon him.  There are numerous failures to appear, as

25    the Court knows, and numerous instances of failure to submit

reports and reports for drug testing.  And so there's a clear
pattern over the course of his supervision period of disregard
for the conditions that the Court has placed upon him.

In addition to that, as Ms. Rivers has just noted, in the
defense's own papers there is an admitted association with a
known felon, which is a violation of another condition, which I
believe the probation office, if the Court were to have granted
a continuance, may very well have presented a new allegation.
And that adds to the pattern of disregard for the Court's
conditions and the Court's trust, Your Honor.

And as the violations report -- the two reports indicate
that the defendant has been very uncooperative and noncompliant
with the probation office's directions through the course of
his supervision period.

As to the questions of the drug use, the defendant not
only has that July 2015 positive test for cocaine and
marijuana, but even in the dismissed allegation with regard to
marijuana use, he has admitted to Ms. Rivers that he was in
association with those who were smoking marijuana.

And the arrest that happened on October 11 of 2015, the
defendant was found driving -- or in possession of a vehicle
where there were numerous butts of marijuana in individual
packages suggesting that the defendant was using -- in
possession of those bags for sales.  And there was a digital
scale that was found in the same place of the vehicle where the

1  marijuana was found.

2      And I believe, if the Court would permit, the probation

3  officer, who has spoken with the arresting officer, the

4  investigating officer, will be able to elucidate further on the

5  question of some of the details of what that arrest was about

6  and what happened there.

7      With regard to the uncharged allegation of kidnapping,

8  rape and the pimping charge, there isn't a formal charge that

9  has been brought in San Bernardino County yet.  That's my

10 understanding.  And that's really one of the reasons why -- a

11 key reason why the Government has moved to dismiss Allegation

12 No. Seven in the interest of justice.

13     But I would submit to the Court that there is reliable

14 information coming from the police officers who have

15 investigated the matter, that the defendant was facilitating

16 prostitution and likely victimizing this minor victim, who

17 appears to have run away from home and placed herself in a

18 situation where there was prostitution going on.

19     But the report from the officers, as Ms. Rivers has

20 gathered, provides the Court with reliable information that the

21 defendant was victimizing or exploiting her, and by making her

22 prostitute and taking all the money that she earned in the

23 course of prostitution.

24     And I believe Ms. Rivers will be able to provide --

25 proffer to the Court that Mr. Bender, at the time of his arrest

1    on October 11th and 12th, was in possession of a hotel keycard

2    that was able to open the door of the hotel room where the

3    victim was, victim's belongings were found.  And the hotel

4    registry also had the defendant's name and the minor victim's

5    name there.

6         So the Government recognizes that all these charges have

7    not been proven in state court, but the defendant's conduct

8    associating with and exploiting a minor victim in prostitution

9    should be a great concern in the Court's consideration of

10   sentence in this matter.

11        So as far as the Government's position goes, the Court --

12   the Government believes that the defendant's admitted

13   violations, his conduct, is egregious because of the continuing

14   disregard for the Court's trust and the conditions of this

15   Court.  But in addition to that, the dismissed conduct from

16   October 11 in particular is greatly concerning, and should lead

17   the Court to -- provides ground for the Court to issue and

18   impose an above-guideline sentence, which the Government

19   believes is appropriate at the level of 18 months of custody

20   with 18 months of supervision to follow.

21             THE COURT:  I would just comment that the

22   allegations involving the minor are extremely serious.  I think

23   I made it clear last time.  I've read the information that the

24   probation officer has provided.  The claims and allegations and

25   information contained in there is serious, but it would seem to

1    this Court that if the Government would want the Court to

2    consider those claims as related conduct, that at the very

3    least the Government would be required to bring the officer in

4    here in court to testify under oath.

5        I don't think that the Court should simply adopt as true

6    the allegations referenced in the reports provided to the Court

7    by the probation officer.  Because of the seriousness of those

8    claims, additional evidence would be required.  So I'm not

9    going to consider that.

10       Now, that being said, if there's an investigation that

11   continues in San Bernardino County by San Bernardino County

12   authorities, they have the ability to bring those charges in

13   San Bernardino.  I would expect they would if they can prove

14   that beyond a reasonable doubt to a jury, they believe they can

15   do that.

16           MR. NAM:  That's correct, Your Honor, but as the

17   Court is well aware, any offense conduct that happens in the

18   state jurisdiction would also constitute a breach of the

19   Court's trust.  And even before there is adjudication in state

20   court, the Court can consider as part of the defendant's

21   overall conduct.  So the Government would request that the

22   Court make consideration of what he was doing, what he was

23   found with as to marijuana and also what -- how --

24           THE COURT:  Well, you have to separate the marijuana

25   issue from the issue involving the minor.  So I think my focus

1    right now is the issue involving the minor.  Again, very

2    serious allegations.  And the Court's view, there are no child

3    prostitutes; they're victims.  They're not prostitutes; they're

4    victims.

5         And if the Government would want me to consider those

6    types of claims, because of the seriousness of those claims, I

7    think would be fundamentally unfair for the Court to consider

8    that without the Government having brought the officers into

9    Court to testify regarding what they observed, heard and saw on

10   the date and time of the arrest.  So I'm not going to consider

11   that.  I don't think it's appropriate, and it would be unfair

12   for the Court to consider that without additional evidence or

13   proof.

14             MR. NAM:  Very well, Your Honor.  Would the Court

15   permit the probation officer to speak to what she learned with

16   regard to the marijuana allegation or marijuana conduct?

17             THE COURT:  With the marijuana conduct, which is the

18   dismissed charge?

19             MR. NAM:  That's correct, Your Honor.

20             THE COURT:  In reference to the information provided

21   by -- I'm not sure what you're asking the Court to do.  Do you

22   want to place her under oath and call her as a witness?  Or are

23   you simply asking that the Court hear from the probation

24   officer?

25             MR. NAM:  The latter, Your Honor.

1          THE COURT:  Yes, go ahead.  If you have any

2    additional information to offer that's not disclosed in the

3    violation report.

4          THE PROBATION OFFICER:  Well, Your Honor, the

5    additional information that I have, unfortunately, although it

6    is in connection with the marijuana charge, it's also in

7    relation to the other charge that -- the other conduct also.

8          THE COURT:  Okay.

9          THE PROBATION OFFICER:  So it's basically what's in

10   the report.

11         THE COURT:  Okay.  Thank you.

12         THE PROBATION OFFICER:  Unfortunately.

13         MR. NAM:  Your Honor, may I make just one comment

14   with regard to the defense's memorandum?  There is a footnote

15   with regard to the confidential letter that the probation

16   officer has submitted to the Court, and I just wanted to make

17   it clear to the Court that Ms. Rivers never disclosed to me

18   what was in the letter.  How that came about was at the last

19   hearing the Court mentioned --

20         THE COURT:  I mentioned it, yes.

21         MR. NAM:  Made a reference, and defense counsel and

22   I, neither one of us knew what the source was.  And in my

23   conversation with Ms. Rivers, I assumed or I made the

24   conjecture that that must have been in that -- in the letter to

25   the Court, and that's the representation that I gave to

1    Ms. Rim, but not having directly heard from Ms. Rivers.  So I

2    just want to make sure to the Court that she never disclosed

3    what was in the confidential letter, but that's an assumption I

4    made and passed on to defense counsel.

5              THE COURT:  Yes, I recognize that.

6         Ms. Rim?

7              MS. RIM:  Thank you, Your Honor.

8              THE COURT:  Before we start, I do have some

9    questions regarding certain of the exhibits.

10             MS. RIM:  Yes, Your Honor.

11             THE COURT:  And maybe before I hear from you, you

12   can provide some guidance regarding the exhibits.  So in your

13   pleading you reference that Mr. Bender -- let's see.

14        After Mr. Bender was released from the Bureau of Prisons

15   on or about February of 2014, and when he was released, he was

16   released to a halfway house, as I understand it.

17             MS. RIM:  Yes, Your Honor.

18             THE COURT:  And then he was released from the

19   halfway house on or about June of 2014.  And then you reference

20   that he started working at Evolution Fresh soon after his

21   release from the halfway house.  And you have attached certain

22   exhibits in support, and I think they're attached as Exhibit B,

23   commencing on page 10, which appears to be check stubs or pay

24   stubs regarding his work at Evolution Fresh.

25             MS. RIM:  Your Honor, I believe Mr. Bender started

1    working at Evolution Fresh while he was at the halfway house.

2              THE DEFENDANT:  No.

3              MS. RIM:  No?

4              THE DEFENDANT:  I was at Ifco.

5              MS. RIM:  I apologize.  It was through a temporary

6    staffing agency at the halfway house.  So he had other jobs

7    while there.  But Your Honor is correct that the employment at

8    Evolution Fresh started when he left.

9              THE COURT:  That was my understanding.  I'm looking

10   at the exhibit, Exhibit B, page 10.  I don't see -- I could not

11   locate any dates.

12             MS. RIM:  Your Honor, those are only a few of the

13   pay stubs that Mr. Bender's friends had in their possession.  I

14   believe they were from April of 2015, because he was there for

15   about nine months.  And so I believe he started -- and

16   Ms. Rivers may have more information about this.  I'm sure he

17   was reporting his employment to her.  But I believe he started

18   working there towards the fall of 2014, and his job ended

19   around May of 2015.

20             THE COURT:  Okay.  Now, I just found it a bit

21   unusual that there were no dates on the pay stubs.  And I

22   didn't pour over every document, I have to confess that, but I

23   was looking at the pay stubs, and I didn't see any dates

24   which -- are there dates?

25             MS. RIM:  Yes, Your Honor.  At the very top, if you

1    see the top right, you will see check date, April 24th, 2015.

2                    THE COURT:  Oh, okay.  The check, that portion was

3    blocked by the way it's placed in the file.  So I did not see

4    that.

5                    MS. RIM:  Oh, I apologize.

6                    THE COURT:  It's not your fault.  It's the way we --

7        So I have three -- it looks like three pages of pay stubs

8    or check stubs.  So again, what was the time frame that he was

9    employed?

10                   MS. RIM:  At Evolution Fresh it was for nine months.

11   He did lose his job there for a variety of reasons:  One, it

12   was only a temporary position.  My understanding, there was a

13   potential for a permanent position, but his vehicle, which he

14   eventually sold a few months later, just kept breaking down,

15   and it was quite a drive.  So he ended up not continuing to

16   work for them, but he did start doing side jobs like at the

17   liquor store.

18                   THE COURT:  It's not clear to me, based on your

19   pleading, as to why he stopped working at Evolution Fresh.  So

20   was he laid off?  Was he terminated?  Did he choose to not

21   continue with employment there?

22        (Counsel and defendant conferred off the record.)

23                   MS. RIM:  Mr. Bender states that he was let go

24   because of his transportation issues.  He was unable to go to

25   work on certain occasions, and so his employment came to an

```
1    end, and that's why he ended up selling that car.

2               THE COURT:  Okay.  The car being --

3               MS. RIM:  The car -- I believe it's Exhibit G.

4    That's the check he received for the car on September 14th,

5    2015, from Abbasi Auto.  And it says in the "For" section "For

6    the old Chrysler 300."  So in the meantime, he was doing odd

7    jobs here and there, including the part-time security.

8               THE COURT:  So in reference to Exhibit G, Exhibit G

9    is a check payable to Mr. Bender in the sum of $1500 from DBA

10   Freeway Auto Center, and it references an '06 Chrysler 300.

11   Then underneath it reads "Refund for" -- and I'm not sure what

12   the words are.  It looks like "Dupont," "Refund for Dupont,"

13   and I didn't understand that.

14      (Counsel and defendant conferred off the record.)

15              MS. RIM:  It was a refund because he was returning

16   the car.  He said there were problems with the ignition.  So I

17   guess he had gotten the car from Abbasi Auto, and because it

18   didn't work, he returned it.  They paid him the 1500.  It looks

19   like 300.  I don't know what that says, Your Honor.  "For due

20   payment"?

21              THE PROBATION OFFICER:  Your Honor, can I correct

22   that?

23              THE COURT:  Yes.

24              THE PROBATION OFFICER:  I have seen this before, and

25   it's "Refund for down payment."
```

 1          THE COURT:  It means down payment.  Thank you.

 2      So when did he leave Evolution Fresh?  I am inquiring from

 3  counsel.

 4          MS. RIM:  My understanding, it was around May of

 5  2015, shortly after the April check stubs.

 6          THE COURT:  May of 2015?

 7          MS. RIM:  Yes, Your Honor.

 8          THE COURT:  And so when did he purchase the vehicle?

 9          MS. RIM:  May I have a moment?

10      (Counsel and defendant conferred off the record.)

11          MS. RIM:  We're not sure, but it's sometime around

12  April or May of 2015.

13          THE COURT:  So one concern I have is one of the

14  claims here is that he left Evolution Fresh because of

15  transportation problems or issues.  He left in May of 2015.

16  The car is not returned until September of 2015.  So from -- it

17  appears from May -- April or May of 2015 to September of 2015

18  he had possession of the vehicle.

19          MS. RIM:  That may be true, Your Honor.  I believe

20  Mr. Bender was borrowing the vehicles of other people to get

21  around, and around September he decided to turn it in because

22  he needed money.  So I'm not a witness so I can't speak to

23  exactly what happened, but my understanding is that he was --

24  the car was having problems, and I think that is probably the

25  only reason why the car center would even agree to give back a

 1    refund for a down payment.

 2        But he was, as the Court is aware, borrowing a truck that

 3    was not registered to him.  He was also borrowing his uncle's

 4    truck when he was living with his uncle.

 5            THE COURT:  So the suggestion being that he had

 6    access to other vehicles in order to continue to work at

 7    Evolution Fresh.

 8            MS. RIM:  Yes, that may be true, but because of his

 9    transportation problems, he had been late a few times, and so

10    the company had let him go.

11            THE COURT:  So they fired him.

12            MS. RIM:  Yes.  That's what I meant by let go.

13            THE COURT:  Okay.

14            MS. RIM:  I believe it was about an hour commute.

15        (Counsel and defendant conferred off the record.)

16            THE COURT:  Now, the vehicle that he was -- he had

17    possession of on the date and time of the arrest -- and I think

18    he was arrested on October 12th.

19            MS. RIM:  11th.

20            THE COURT:  October 11th, 2015.  The vehicle that he

21    had possession of belonged to -- it says "Barry, Karen Denise."

22    Denise Karen Barry?

23            MS. RIM:  Yes, Your Honor.

24            THE COURT:  Who is that.

25            MS. RIM:  That is someone Mr. -- Mr. Bender did meet

1   Ms. Barry at the halfway house, and they did have a romantic

2   relationship.  And that is something that Mr. Bender is aware

3   that he wasn't supposed to do.  I believe he had spoken to his

4   probation officer about this matter before to disclose the

5   relationship, and she had expressed her disapproval, and they

6   did try to stay away from each other for a time.

7        When he was no longer able to stay with his uncle,

8   Mr. Bender didn't have a place to go.  His mother lives in

9   housing that has rules and doesn't allow felons to live with

10  her.  And so at some point he and Ms. Barry did come back into

11  contact with each other, and that is something that he does

12  admit and is ready to accept responsibility for.

13             THE COURT:  So he's released from the halfway house

14  in June of 2014, and at that time he established a relationship

15  with Ms. Barry, and he purchases a vehicle with her?

16             MS. RIM:  No.  The vehicle is her vehicle.

17             THE COURT:  Her vehicle.

18             MS. RIM:  Yes.  His mother is also named on the

19  registration.

20             THE COURT:  Yes.  And how did that occur?  That's a

21  bit unusual.

22             MS. RIM:  That, I don't know, Your Honor.

23             THE PROBATION OFFICER:  I think, for clarification,

24  from my understanding, it's actually her mother who has since

25  passed, and Ms. Barry is on the registration.

```
1              THE COURT:  Whose mother?

2              THE DEFENDANT:  My mother.

3              THE PROBATION OFFICER:  Your mother.

4         It was my understanding it was Ms. Barry's mother.

5              THE COURT:  It says "Registered owner:  Barry, Karen

6    Denise," and then "or Bender, Tammy Irene."  So it appears that

7    the vehicle is owned by -- the truck is owned by the

8    defendant's mother.

9              THE PROBATION OFFICER:  Yes, Your Honor.

10             MS. RIM:  Your Honor, I'm sorry.  I don't have

11   enough information to represent why Mr. Bender's mother is on

12   the vehicle, but I have spoken --

13             THE COURT:  But it is.

14             MS. RIM:  And I have spoken to Ms. Barry, and it is

15   her truck, and I believe --

16             THE COURT:  Well, it's not her truck because it's

17   registered to both.  She may believe that it's her truck or

18   vehicle, but the registered owners here are the registered

19   owners, and this is an official document from the State of

20   California.  It's all certified.

21             MS. RIM:  I guess a better way to put it is it's

22   primarily in Ms. Barry's possession, the truck.

23             THE COURT:  She possessed it, but I'm curious as to

24   why the vehicle was registered under Mr. Bender's mother's name

25   and Ms. Barry's name.  One inference that the Court could draw
```

UNITED STATES DISTRICT COURT

1    from this is that the vehicle -- because Mr. Bender had a

2    romantic relationship with Ms. Barry, and it appears that the

3    vehicle -- let's see.

4         So he was released from the halfway house in June of 2014.

5    It looks like they purchased a vehicle -- Ms. Bender and

6    Ms. Barry purchased a vehicle one month thereafter.  That leads

7    me to believe or one inference that one can conclude is that

8    Mr. Bender purchased the vehicle with Ms. Barry and placed his

9    mother's name on the registration.

10        (Counsel and defendant conferred off the record.)

11             MS. RIM:  Your Honor --

12        (Counsel and defendant conferred off the record.)

13             MS. RIM:  Your Honor, I don't believe the Court's

14   inference is correct.  My understanding is that --

15             THE COURT:  Well, it's not correct if we adopt the

16   position of your client, but this has to be explained because

17   he leaves in June of 2014 and June -- yeah, of 2014, the

18   halfway house, and the next month there's a vehicle that's

19   purchased with Ms. Barry and Ms. Bender.  So --

20             MS. RIM:  This is not a purchase receipt,

21   Your Honor.  It's a registration.

22             THE COURT:  Yes, it's a registration.

23             MS. RIM:  I don't believe it was purchased at this

24   time, the vehicle.

25             THE COURT:  Well, let's separate purchase.  He

1    registers the vehicle or a vehicle is registered with Ms. Barry

2    and Ms. Bender, and I'm trying to have you explain.  These are

3    your documents and your client's documents, and explain why.

4                   MS. RIM:  May I have a moment?

5                   THE COURT:  Yes.

6           (Counsel and defendant conferred off the record.)

7                   THE COURT:  The import of this, this reference to

8    the dismissed claim, the marijuana claim, one of the claims

9    here is that the marijuana was not his because the truck was

10   not his.

11                  MS. RIM:  Oh, I see, Your Honor.  Okay.  Well --

12                  THE COURT:  And it appears that the truck may have

13   been registered in someone else's name but a vehicle that he

14   primarily drove.

15                  MS. RIM:  Well, I think it's clear that Mr. Bender

16   was driving that truck, had the keys to that truck.  We

17   maintain that he's not the owner of the truck.  It is

18   Ms. Barry's truck, and his mother -- Your Honor is correct,

19   that his mother's name is on the registration, but for

20   practical purposes, it is Ms. Barry's truck.

21          That being said, I am not suggesting that the marijuana is

22   Ms. Barry's.  I did get a phone call from an individual

23   yesterday evening from a male named Jamar who called me and

24   informed me that the marijuana belonged to him.  Now, I did not

25   have an investigator present.  I don't know what to say about

1    it.

2       This gentleman informed me that when Mr. Bender was

3    helping the people move from the apartments to the motel, he

4    had -- Jamar had put his marijuana and the scale in this locked

5    compartment and then just forgotten to take it out.  That's --

6    again, I haven't presented anything to the Court because I

7    didn't have anyone else present.  This call came in

8    approximately 10:00 p.m. last night on my cell phone at my

9    home.

10             THE COURT:  Since it is highly unreliable, the Court

11   can't consider that.

12             MS. RIM:  Your Honor, I think what the Court can

13   consider is that Mr. Bender consented to the search of the car,

14   and he didn't say, "There's marijuana in the car."  If this is

15   a person who knows he is going to be caught with drugs --

16   Mr. Bender -- when the cops stopped him for his felon-

17   in-possession case and there was a gun underneath the driver's

18   seat, he told them, "Yes, it's my gun, it's my gun, and I got

19   it from my mom."  He is sort of a blurter.  So Mr. Bender --

20             THE COURT:  No.  He first said in that underlying

21   case when they stopped him and they were asking what he was

22   reaching for, he said he was reaching for a cigar.

23             MS. RIM:  That's correct.

24             THE COURT:  It was only after the officers located

25   the weapon that he indicated -- that they found a loaded Ruger.

1    I believe it was a .45 caliber.  It was only at that time that

2    he said it belonged to his mother.  So he wasn't accepting

3    responsibility.  He was indicating he had purchased it for his

4    mother.

5            MS. RIM:  He didn't say it belonged to his mother,

6    just to be clear.  He said he had gotten it for her.

7            THE COURT:  Is that a distinction with a difference?

8            MS. RIM:  Well, I think that he also told the

9    officers, "I know I messed up."

10            THE COURT:  Let's get back to your other point, how

11    it adds credibility to his claim here --

12            MS. RIM:  Yes, Your Honor.

13            THE COURT:  -- that the reason why he allowed the

14    officers to search the vehicle is because he didn't think there

15    was marijuana in the vehicle.  I think that's one of the points

16    you were making in your pleading.

17            MS. RIM:  Yes, Your Honor.  I believe Mr. Bender

18    didn't know there was marijuana in the vehicle.

19            THE COURT:  And one of the items of evidence or

20    factors you would want the Court to consider is because he

21    allowed the officers to search the vehicle and consented to the

22    search, that suggests that he was not aware of marijuana being

23    in the vehicle.

24            MS. RIM:  Yes.

25            THE COURT:  And that does not comport with life

1    experience.  I've handled too many cases to count where persons

2    have provided consent at times when they should not have and

3    made statements to officers at times they should not have.  The

4    courts are filled with these types of -- with this type of

5    similar conduct.

6           MS. RIM:  Your Honor, whatever inference the Court

7    will make is up to the Court, obviously.

8           THE COURT:  Yes.

9           MS. RIM:  I can only contend that Mr. Bender

10   vehemently maintains his innocence with respect to the

11   marijuana charge.  Honestly, with the photos, when I am showing

12   him the photos, he asked questions like, "Is the marijuana in

13   the jar?  Is the marijuana in the plastic bag?"  He has no

14   idea -- when the Government produced the photos to me, I

15   couldn't find the photo of the marijuana, and we were sitting

16   there trying to guess where it might be in these photos.  This

17   is not a person who is aware what the marijuana in that car

18   even looked like.

19        It is also not consistent with the cash that was found in

20   Mr. Bender's possession.  A person who is selling nickel/dime

21   bags of marijuana in the streets has fives and singles in his

22   possession.  He needs to give change.  People aren't paying him

23   in hundreds for marijuana in that neighborhood.

24        And with respect to the liquor store, the security guard

25   there told the officers and my investigator, according to the

1   security guard, that he was paying Mr. Bender in cash for his

2   work at the liquor store, and that, indeed, that very day had

3   paid him $150.

4       And so I recognize that there was contraband found in

5   Mr. Bender's car, but I would submit, just based on the

6   patterns of his violations, this is just so drastic.  He's

7   someone who might be irresponsible enough to lose his job,

8   might be irresponsible enough to fail drug tests, and crack and

9   booze, but the idea that he would be stupid enough to sell

10  while he is on federal probation -- I mean, I'm not saying that

11  that's never happened.  Of course it's happened.

12          THE COURT:  It regularly happens.

13          MS. RIM:  I'm sure it's happened before this Court.

14  And I apologize for my tone.  It's difficult because this has

15  been an emotional roller coaster for Mr. Bender, especially

16  since I represented to him on Monday that the Government would

17  not be relying on these facts relating to the marijuana in

18  sentencing because that's what the Government represented to

19  me.  I am not saying that means they can't.  But it has made

20  the process a lot more difficult for Mr. Bender to go up and

21  down, up and down.

22          THE COURT:  So at the time he is arrested in the

23  vehicle, how much money is found in the vehicle and then in his

24  possession?

25          MS. RIM:  It's inconsistent.

1          THE COURT:  No.  How much?  What's the total sum?

2          MS. RIM:  Well, the pictures show approximately, I

3    think, $408, but the police report indicated $300, I believe,

4    in his pocket and $300 in his wallet.  But as the Court can

5    see, he had just cashed a check for a car that he had sold.

6        I'm sorry?

7        (Counsel and defendant conferred off the record.)

8          MS. RIM:  And he was getting paid in cash by the

9    security guard at the liquor store.

10          THE COURT:  Who paid him in cash for his employment

11    at the liquor store?

12          MS. RIM:  There's a --

13          THE COURT:  I understand that there's a suggestion

14    that he was paid in cash.

15          MS. RIM:  No, there's a memo of an interview that my

16    investigator conducted with the security guard at the liquor

17    store, Mr. Seuta.  He is a security guard.  He stated he paid

18    Mr. Bender $150 in cash for helping him with part-time security

19    at King Tut Liquor.  Mr. Seuta is a regular security guard, but

20    occasionally pays people part time to cover his shift, and that

21    would be Mr. Bender.

22        And then at the last paragraph he states that he recalls

23    telling the officers he had just paid Mr. Bender $150 cash for

24    part-time work that evening.  And, in fact, you can see in the

25    photos that there is a bill for 50.  I had thought it was a 5,

1    but I was incorrect.  On page 8, Exhibit F, there is a $50 bill

2    right above the three $5 bills.

3            THE COURT:  Ms. Rim, I just find it difficult to

4    accept the claim that it just so happened on the date that he's

5    arrested in the vehicle that somebody had paid him $150 in cash

6    to take over that person's position as a security officer or

7    person at a liquor store.

8            MS. RIM:  It wasn't for that day, Your Honor.  It

9    was Mr. Bender had done the work that week.  Mr. Seuta had paid

10   him that day.  That was why Mr. Bender was at the liquor store,

11   to receive his payment.  And not all of the money, obviously,

12   is from that one payment, Your Honor.

13           THE COURT:  Ms. Rim, you may accept that.  I find it

14   difficult to accept as being reasonable.

15           MS. RIM:  Yes, Your Honor.

16           THE COURT:  Okay.  And how many hours did he work at

17   the liquor store that allowed for the $150 in compensation?

18           MS. RIM:  It was over the course of a few days.  He

19   would work in the evenings.

20       (Counsel and defendant conferred off the record.)

21           MS. RIM:  From 8:00 in the evening until 1:00 in the

22   morning.

23           THE COURT:  And I would hope that the position as a

24   security guard for the liquor store didn't require or allow him

25   to have a weapon.

1          MS. RIM:  No.

2          THE COURT:  And so how much was he getting paid per

3     hour?

4          MS. RIM:  I think it was $150 her shift.

5        Is that what it was?

6        (Counsel and defendant conferred off the record.)

7          MS. RIM:  It was a flat rate of 150.  The security

8     guard -- the security guard was -- it was not a formal paycheck

9     arrangement, Your Honor.  As Your Honor's aware, it's difficult

10    for felons to find jobs where they give you a paycheck.  So you

11    have to do side jobs here and there.  This was a security guard

12    who knew Mr. Bender.

13         THE COURT:  He had a job where he was receiving a

14    paycheck, and he was fired from that position.

15         MS. RIM:  Yes, Your Honor.

16         THE COURT:  Yes.  So he has to accept some

17    responsibility for his conduct.

18         MS. RIM:  Absolutely, Your Honor.  Mr. Bender messed

19    up.  He did.  I understand that the Court is not taking the

20    allegations regarding the minor into consideration, but just on

21    behalf of Mr. Bender I would just like to state that the text

22    messages from this minor strongly refute --

23         THE COURT:  I wouldn't -- it's not necessary to

24    cover what the minor said in reference to the allegations here.

25    Those are very serious allegations, as I mentioned.  And if I

1  was to take them into consideration, he would receive the

2  maximum that the Court can impose.  So I am not going to impose

3  the maximum.

4         MS. RIM:  Yes, Your Honor.  Just with respect to --

5  even if the Court wants to accept that the marijuana in the

6  truck was Mr. Bender's, which we still maintain it wasn't, I

7  would just like to point out this isn't someone who's asking

8  his lawyer, "Just give me the time and terminate, you know.

9  I'm done with this."  He wants to go to a halfway house because

10 he wants to get back on his feet.

11        And I would just like the Court to take that into

12 consideration because so many defendants come in here and want

13 to be done with supervision.  They don't want to go through the

14 testing.  They don't want to get a job.  They just want to be

15 done.  And Mr. Bender, despite all these allegations, still

16 wants some chance.

17        And so if the Court does impose a prison sentence, I

18 would, obviously, ask for four months, along with six months at

19 a halfway house is what I would ask for if the marijuana

20 weren't an issue.  But even if the Court is to impose a term of

21 imprisonment, I would submit that the low end is appropriate

22 given the proven allegations, the ones he admitted.

23        Although he did mess up, Mr. Bender is someone who has had

24 a lifetime of mental illness and physical abuse and drug

25 addiction, a person who for nine months did make an effort to

1    try to get on his feet and become a productive member of

2    society, and he messed up, and he's aware of that.

3        So I would just like to ask the Court to not give up on

4    him and punish him accordingly, but also afford him some time

5    at a halfway house so he can get back on track.

6        THE COURT:  What's his relationship -- are they

7    still seeing each other, Ms. Barry and Mr. Bender?

8        MS. RIM:  Well, they probably can't anymore.  I

9    believe they do still want to be with each other, and my

10   understanding is they would like to get married.  They have

11   been together for a while.  They did meet at the halfway house

12   and were supportive and encouraging of each other.  She works

13   at a hair salon, and she works a lot.

14       THE COURT:  Yes.  But do you understand -- I'm

15   looking at the evidence here, and it appears that -- it

16   appears, and I haven't drawn this conclusion, that Mr. Bender

17   is pretty savvy here.  He recognizes that he should not and

18   cannot have a relationship with Ms. Barry.  He meets her at the

19   halfway house.  He has a relationship with Ms. Barry.  And he

20   registers a vehicle not in his name, but in his mother's name

21   with Ms. Barry because he doesn't want the probation officer or

22   the Court to discover that he's having a relationship with a

23   felon.

24       So that's -- so it appears to me that Mr. Bender is savvy,

25   sophisticated, streetwise, and his claims that he was at the

1  wrong place at the wrong time in the wrong vehicle involving --

2  with marijuana that he has no knowledge about, when he has $300

3  in cash on his person when he is not employed, and it just so

4  happens that someone paid him $150 cash on that date who isn't

5  here in court today, it just doesn't resonate as being

6  truthful.

7          MS. RIM:  Yes, Your Honor.  Just to clarify,

8  Mr. Bender did disclose the relationship to the probation

9  officer, and I believe he asked her permission, and Ms. Barry

10  asked her officer for permission.  So I just wanted to -- with

11  respect to the registration, my understanding is at the time

12  the car was registered, Mr. Bender did not have a driver's

13  license yet.  I actually did attach a copy of his license when

14  he got it.  It was a very proud moment for him because he

15  hadn't had one for -- in a long, long time.

16      Of course the Court must make whatever inference it will

17  make, but some of the statements, I just wanted to clarify, are

18  not necessarily done with guile.

19          THE COURT:  So let me just hear from the probation

20  officer.

21      Was the relationship between himself and Ms. Barry

22  reported?

23          THE PROBATION OFFICER:  Your Honor, he asked for

24  authorization, and he was specifically told "no," due to the

25  fact that they had met at the halfway house, their criminal

1    histories, and at that time both of them had just gotten

2    released from the halfway house and they were both unstable.

3    So they were specifically told "no."  He actually met with --

4    both officers were advised and involved in this situation.

5              THE COURT:  So getting -- moving back to --

6        Thank you.

7        Moving back to the allegations contained in the petition,

8    he hasn't been compliant in submitting truthful supervision

9    reports, and he hasn't done that -- he did not comply for

10   November, December and January through June of 2015 -- December

11   2014.

12             MS. RIM:  I believe that was amended, Your Honor.

13             THE COURT:  That's correct, it was amended.

14       In Count Two he was ordered to participate in outpatient

15   substance abuse treatment, and he failed to report on October

16   3rd, 6th, 18th, 31st, November 5th, 13th, 15th, 21st and

17   December 5 and December 9, so a significant period of time.  I

18   understand complications with trying to get to all of your drug

19   testing, but that seems to be excessive.

20       And then we have Count No. Four, having been ordered by

21   the Court to participate in outpatient substance abuse

22   treatment, he fails to report on May 26, June 6, the 17th of

23   June, the 25th of June and July 6, 2015.

24       And then Count Five he used cocaine and marijuana on July

25   17th, 2015.  And then Count Six he was supposed to report his

contact with San Bernardino.  So there are a series of breaches
of trust here, and some of his claims do not resonate as being
truthful.

So let me just seek information from the probation
officer.

Is Mr. Bender -- we have limited resources for -- to
assist persons who have substance abuse.  We should make sure
the persons referred to facilities are persons who can benefit
and are willing to comply with the rules.  Is Mr. Bender a
likely candidate based on your experience with him?

THE PROBATION OFFICER:  My experience with him,
it's -- it's -- it's difficult to answer because when he was
structured for that short period of time, he was going to drug
testing.  However, once we -- once he got frustrated with the
conditions of supervision, I should say, that's when Mr. Bender
said he didn't have a problem.  He didn't necessarily think
that he needed substance abuse treatment.

And I would like to clarify, Your Honor, with regards to
mental health counseling and mental health therapy, he was
given an assessment, and at that time it was determined he did
not need treatment.  In March, when Mr. Bender tested positive,
although the allegation was dismissed, I did address that
conduct with offering him more treatment, which is the MRT
program, and he refused that.

So I don't want to sound jaded, Your Honor, but seeing a

1    lot of people in court wanting to go through treatment, but

2    when we are in the office and we're staffing things and we are

3    discussing with him and he is actually having to face the

4    realities of going to these programs, we actually hear

5    something different, and he has shown something different.

6              THE COURT:  Anything further from counsel?

7         And I have Mr. Bender's statement that's been included

8    here in the pleading, which the Court has reviewed.

9         And, Ms. Rim, you really have done a pretty thorough job

10   of providing the Court with as much positive information on

11   your client that I think anyone could, and certainly there's

12   some positive aspects here.

13        Do you have anything else to offer?

14             MS. RIM:  Your Honor, I just want to state that when

15   you have your whole life and you have a record, you have mental

16   illness problems, you have an addiction, you have a history of

17   abuse, you're going to mess up.  I'm not saying it's okay, but

18   I'm not surprised that someone with this history as ended up

19   with a violation record like this.

20        The question to me is always -- you know, when I seek a

21   sentence, is always does the defendant want to try?  And I

22   would just like to submit that from my experience with

23   Mr. Bender -- I'm sorry.  He is someone who wants to make that

24   effort.  So for what that's worth, I would ask the Court to

25   take that into consideration.

1          THE COURT:  Mr. Bender, you have a lawyer who truly

2     believes in you and your future.  Do you have any additional

3     statements to make, sir?

4          (Counsel and defendant conferred off the record.)

5          THE COURT:  You're not required to, but feel free to

6     make a statement if you choose to.

7          THE DEFENDANT:  First and foremost, Your Honor --

8          THE COURT:  Pardon?

9          THE DEFENDANT:  First and foremost, I would like to

10    apologize for even coming before you in your courtroom behind

11    these allegations that I am being violated for.  True, when I

12    came home -- you know what I'm saying, I had the mind state to

13    go ahead, come out here, get a job.  You know what I mean?  And

14    try to go ahead and build something productive for myself,

15    knowing that I was taking these medications, I told myself I'm

16    going to get off of them because it's a lot of things that I

17    was unable to do taking some of these medications.  Some of

18    these medications make me sleep all day, you know.  Some of

19    these medications, they cause me to feel some type of way to

20    where I can't interact with a lot of people.  They make me have

21    mood swings.

22       So yeah, I did say, "No, I don't need it.  I'm going to

23    try to go without it."  I went to the halfway house.  You know,

24    once I completed my classes and start going out into the

25    community, I went out and got jobs.  I brought job leads back

1    for others who were at the halfway house with me, at the BSS

2    halfway house in Rubidoux there.  I helped the program director

3    there, Shanie Gray, you know, help assist her with other people

4    that had messed up backgrounds to where they said they couldn't

5    find jobs.

6         First job was Ifco.  They hire anybody.  All they want to

7    know is if you are going to work.  That was my first job.  I

8    came in, did what I had to do.  I found another job, a better

9    job.  I start working there.  Shortly after that, I was

10   released from the halfway house.

11        Now, my grandmother died, and that's where I was supposed

12   to parole to when I came home, but she ended up dying in 2013

13   before I was even able to come home.  So, really, I had nowhere

14   to go.  I had to rely on a friend of the family that I looked

15   on as an uncle.  Upon me being let go at Ifco, it was some

16   situations that was going on to where I couldn't make ends

17   meet.

18        And then I was told by a guy at the halfway house that I

19   could go to Volt.  It's a temp agency in Riverside off of Iowa

20   Street.  I went in there, and that's when I got the great

21   opportunity to work through Ifco, which is -- not Ifco, but

22   Evolution Fresh, which is a juice-making company by Starbucks.

23   I learned a lot of trades at that company.

24        And it bothered me heavily because I was happy there, but

25   at the same time having problems with transportation, which my

1    probation officer knows because I have even received a driving-
2    without-a-license ticket on a day that I wasn't even supposed
3    to be at work, but I was asked because the machine operator
4    couldn't come in because he was sick, which was the same
5    vehicle that was registered to Mrs. Karen Barry and my mother.
6    Me not having a license at the time, yeah, my mother went on
7    and put herself on the thing.

8        That's why I was able to go ahead and use this car to
9    obtain my driver's license.  Now, true enough, I did bring it
10   to Mrs. Rivers' attention that yeah, this is a woman that I
11   really want to be around.  We had fell in love and everything,
12   but at the same time it was like we had achieved a lot, and for
13   me to be around somebody that I felt like I can achieve a lot
14   with, that's where I wanted to be.

15       I mean, true enough, I made a wrong decision by doing
16   that, but I couldn't help myself.  You know, like I have done
17   classes with her.  I have enrolled in Second Chance Program
18   with the Fontana Police Department, which indicates that I'm
19   not even around gang activity anymore because this is the type
20   of stuff that they want to know about.

21       I'm taking these initiatives to go ahead and step away
22   from that type of life, and, you know, in the course of it, you
23   know, I thought I was doing good and working overtime.  Yeah,
24   at times I did miss some tests, and I apologize for that, you
25   know.  I thought that by me working, it would be overseen, but

```
1    it wasn't.

2         So yeah, I made the backslide.  It was hard for me going

3    to work.  I got some points at work that led to me be being let

4    go of.  In between that time, you know, I lost my place to

5    stay.  I came out.  I'm back and forth from my mother to my

6    uncle.  Me and my uncle got into it because I can't pay him the

7    rent.  I turned my car back in to fix another car, and it was

8    just like an ongoing thing to like, yeah, I ended up using.  I

9    ended up getting weak enough, falling short enough to use.  And

10   overall, you know, I would like to apologize to the Court for

11   that.  I made a mistake.

12             THE COURT:  I think I understand what you're saying,

13   and I accept your comment that you accept responsibility.

14         Anything further?

15             MS. RIM:  No, Your Honor.

16             MR. NAM:  Just a brief factual point, Your Honor.  I

17   believe the probation officer has an additional factual

18   assertion to make based on her conversation with police

19   officers that is directly relevant to the marijuana conduct.

20             THE COURT:  I think enough has been said regarding

21   the marijuana.

22             MR. NAM:  Very well, Your Honor.  Nothing further,

23   Your Honor.

24             THE COURT:  Mr. Bender, having admitted violations

25   to Counts One, Two, Four, Five and Six, the Court would accept
```

the admissions to those allegations in the petition.  The Court

would find the defendant to be in violation of the terms and

conditions of supervised release.  His supervision is revoked.

The defendant is committed to the custody of the Bureau of

Prisons to serve a term of 12 months, which is the midrange.

Following his term of 12 months, the defendant is placed back

on supervised release for a term of 18 months under the

conditions previously imposed, with the additional added

conditions:  The defendant, Mr. Bender, is not to have any

contact with any minor, that's any person under the age of 18,

with the exception of family members.  That would not preclude

him from going to locations that employ persons under the age

of 18, such as restaurants and other establishments.

The defendant shall comply with rules and regulations of

the U.S. Probation Office in General Order 05.  He shall

participate in a period not to exceed 120 days in home

detention, which may include electronic monitoring.  He shall

maintain a residential telephone line without devices/inner

services that may interrupt the operation of the monitoring

equipment.

When not excused for training or school or employment or

other acceptable reasons, the defendant shall perform 20 hours

of community service as directed by the probation officer.  The

defendant shall participate, as directed by the probation

officer, and complete a cognitive-based life skills program.

```
 1          In reference to his association with Ms. Barry, as a
 2   practical matter, I recognize that Mr. Bender may, because of
 3   his prior history here, may be in a position where he's only
 4   able to meet persons with similar backgrounds.  So I'll leave
 5   it up to the probation officer to determine if his relationship
 6   with Ms. Barry is a relationship that can serve both in a
 7   positive manner.
 8          And so if the probation officer determines that that is a
 9   relationship that will assist Mr. Bender and at the same time
10   assist Ms. Barry, then the Court would not object to that
11   relationship continuing.  That is going to be really at the
12   discretion of the probation officer.  I just cannot tell.  I
13   just don't have enough information.  And it may be that if
14   they're both going to various programs together and support
15   each other, that may, in the long run, be helpful to both, but
16   I just don't know.
17          In terms of placement, do you have any recommendation for
18   placement?
19              MS. RIM:  I would ask for a Southern California
20   designation, Your Honor.
21              THE COURT:  The Court would recommend a California
22   designation.  It's a 12-month custody, but the Court would
23   recommend a facility that, hopefully, could best address the
24   defendant's mental health status and also his substance abuse
25   issues.
```

1      So you have a right to appeal your sentence if you believe

2  your sentence is contrary to law.  With few exceptions, any

3  notice of appeal must be filed within 14 days of today's days.

4          MS. RIM:  Your Honor, may I ask that the Court

5  sentence him to a year and a day so he can receive good-time

6  credits?

7          THE COURT:  I understand your request, and you have

8  convinced me to sentence him under a term that I was leaning

9  towards before I received your pleadings here.  So I think he's

10  been given the benefit of all doubt in his favor, so the

11  request would be denied.

12          MS. RIM:  Thank you.

13      The only other question I had, Your Honor, with respect to

14  the home detention, I don't know if Mr. Bender has a home where

15  that would be possible.

16          THE COURT:  Again, the probation officer will have

17  discretion here.  If he physically does not have a home, if

18  he's homeless and he cannot comply with his condition, then it

19  would be up to the probation officer to excuse him from that

20  condition.

21          MS. RIM:  And the Court wouldn't consider placement

22  at a halfway house instead during that time?

23          THE COURT:  If the probation officer makes that

24  recommendation, the Court would allow the probation officer to

25  accomplish that.  So we have few resources.  Again, they have

1    to be dedicated to persons who are going to be able to benefit

2    from those resources, and the probation officer is in the best

3    position to determine who should benefit.

4              MS. RIM:  Finally, Your Honor, with respect to the

5    condition regarding the minor, if the Court was not considering

6    that uncharged conduct, I would have to state for the record

7    that I would object --

8              THE COURT:  Your objection is noted for the record.

9    And, Ms. Rim, it's in his best interest not to have any contact

10   with a person under the age of 18.  It can only complicate his

11   life.

12             MS. RIM:  Yes, Your Honor.  Thank you.

13             THE COURT:  Again, it doesn't apply to family

14   members.

15             MS. RIM:  Yes, Your Honor.

16             THE COURT:  Thank you.

17             MR. NAM:  Your Honor, just one procedural point.  In

18   the defense's paper there is an abbreviated reference to the

19   alleged victim in the state case, in the Pippin case, and I

20   haven't discussed this with counsel yet, but the Government

21   would request that the memorandum be sealed, although it is an

22   abbreviated reference, there is concern.

23             THE COURT:  You are asking what to be sealed?

24             MR. NAM:  The defense's sentencing memorandum that

25   the defense filed on Wednesday.

1            MS. RIM:  I don't object to that, although we did

2   use an initial for that.

3            THE COURT:  Let me ask the clerk, how --

4            THE COURTROOM DEPUTY:  Well, normally, if it's

5   abbreviated, it doesn't matter, but it's up to you, Your Honor.

6            THE COURT:  When you say "abbreviated," is it

7   initials only?

8            MR. NAM:  First initial and last name.

9            THE COURT:  That should be sealed.  The Court would

10  order it sealed.

11       And there is no objection to that?

12            MS. RIM:  No objection.

13            THE COURT:  Okay.  Thank you.

14            MR. NAM:  Thank you.

15            (Proceedings concluded at 2:24 p.m.)

16                      ---oOo---

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

        I, CAROL JEAN ZURBORG, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date:  March 15, 2016

                    /s/ CAROL JEAN ZURBORG
            _____
            CAROL JEAN ZURBORG, CSR NO. 7921, CCRR
                Federal Official Court Reporter

UNITED STATES DISTRICT COURT